McMILLAN *v.* DUNLAP.

4-7166                                    175 S. W. 2d 987

Opinion delivered December 6, 1943.

F. D. *Goza* and *Martin, Wootton & Martin*, for appellant.

H. B. *Means* and *Bridges, Bridges, Young & Gregory*, for appellee.

GRIFFIN SMITH, Chief Justice. D. W. McMillan and his son, H. W., are practicing attorneys at Arkadelphia. They are also large owners of land, and from time to time buy and sell.

Howard Dunlap is a barber and has resided at Malvern for eighteen years. Duncan Cothern, a resident of Dierks, is District Forester at Malvern, employed by the State Commission. Tom Hopson, a woods foreman for Dierks Lumber and Coal Company, is in charge of buying timber for the Company's Mountain Pine mill. Fred J. Leeper, a resident of Hot Springs, buys and sells timber. For thirty years he was employed by Dierks Lumber and Coal Company. Allen Bryant, a State game warden, resides at Magnet Cove.

The appeal is from a judgment against D. W. McMillan for $2,160, in favor of Dunlap and Cothern. They alleged a written contract based upon a McMillan letter of April 16, 1941, wherein Dunlap, the addressee, was told that the McMillans owned about 14,000 acres in Garland county, an equal acreage in Pulaski and Saline counties, and 3,800 acres in Perry county. In this letter it was said:

"If you will introduce us to the purchaser, or the broker or the agent of the purchaser and we finally make a sale to the purchaser or through the broker to whom you introduce us, we would be willing to pay you and the broker together at the rate of twenty-five cents an acre for any land you sold through you or your broker."

It was further stated by the McMillans that they would be glad to meet any prospect Dunlap might have and would "try to work out a trade with them."[1]

Dunlap testified that he first met the McMillans in connection with an option he had procured on 8,000 acres belonging to Moline Timber Company. The McMillans expressed a desire to sell the lands involved in this controversy, lying in Garland county. Dunlap did not then know of a possible purchaser, but later learned that Cothern had a "prospect." Cothern, however, refused to disclose whom his client was but suggested that Dunlap procure a contract; whereupon Dunlap said he informed the McMillans "about this" and they delivered to him the letter of April 16. It was exhibited to Cothern, who proposed a meeting. A few days later the four met at Hot Springs and from there went to Mountain Pine where the Dierks Company had offices. Dunlap did not disclose his destination to the McMillans until the car in which they were driving left the Mt. Ida road.[2] At the Company's office (Cothern alone went into the building) it was ascertained that Hopson was absent and would not return until "around three or four or five o'clock." The callers then went to a nearby grove and waited an hour

---

[1] The letter concluded as follows: "We of course will not give an exclusive option to anyone as we have other prospects we will work with and if we make a sale to anyone except through the broker to whom you introduce us, we would not expect to pay either you or him any commission. Of course, if the broker gets a live prospect ready to go on the land and spend some money in having it examined, we naturally would give them a reasonable time to make a reasonable inspection and if they want to make a careful cruise on it for a reasonable payment of earnest money, we would give them a reasonable time to make a careful cruise of the property. The land business is very active at present and we would not want to and would not agree to tie up our land exclusively to anyone. We are ready to go anywhere you suggest and meet anyone you suggest that you feel like is in the market for lands and will do what we can to cooperate with you in making a sale to your broker or his client."

[2] Apparently this trip was made in a car belonging to the Mc-Millans.

or more. Dunlap went to the commissary for cold drinks. Upon returning Cothern told him the McMillans did not want to wait any longer. Dunlap says he "suggested" that they remain a little longer, and when Hopson returned he would have introduced the McMillans to him. "It was my understanding," said the witness, "that to earn this twenty-five cents per acre I was to introduce the McMillans to the man who later bought and to keep my hands off after that." Dunlap swore that he did not have authority to quote prices. His sole purpose was to introduce the prospect.

Although the date of this meeting is not mentioned by the witness, it must have been after April 19, 1941, for on the nineteenth D. W. McMillan wrote Dunlap:

"We have given you letter which will protect you if your man buys. If he will not come [to Arkadelphia] we suggest you arrange for a conference at Hot Springs and we will go over there to see him."[3]

It is argued by appellants that when sale was made to Dierks nearly a year later[4] they did not take advantage of or act upon information procured from either Dunlap or Cothern. On the contrary, they were approached by Leeper, to whom a commission of $1,400 was paid. Leeper, during the late weeks of 1940, procured from Malvern Lumber Company an option on the property. He then talked with Hopson in an effort to sell to Dierks at $2.50 per acre. The offer was declined; whereupon Leeper talked with D. W. McMillan. While the option was in force Leeper mentioned to McMillan that Dierks was a "prospect." Leeper also stated, while trying to sell to the McMillans, that if they would buy, he would in turn sell the property to the Dierks Company. On cross-examination Leeper testified: "At the time I had the option and offered [this land] to Dierks, they wanted to deal directly with the man who owned it. I told them they wouldn't get it, and then [I] sold it to the McMillans. I was a real estate broker in 1941 and 1942."

---

[3] It is suggested by appellants that the Hot Springs meeting and trip to Mt. Ida probably occurred thirty days after April 16, 1941.

[4] Contract for the sale, according to the testimony of H. W. McMillan, was dated February 7, 1942.

A second defense is that neither Dunlap nor Cothern was a licensed real estate broker: hence, under §§ 12476 to 12486 of Pope's Digest, recovery is prohibited.[5]

Did Dunlap's activities bring him within the interdictions of the brokerage Act?

On cross-examination letters written by Dunlap were admitted in connection with his testimony that "the Moline Timber Company option was among the first I wanted to sell." The witness then explained that he was not trying to buy on his own behalf, "because I was 'broke' and couldn't buy, [but] I was not attempting to sell any real estate." The activating purpose, said he, was to obtain options on realty, or to cause buyer and seller to get together "so I could get a commission out of it." In a letter of May 20, 1941, to one of the McMillans, Dunlap mentioned "a second prospect," and then wrote: "I think you can deal with him more easily by taking the lead. If you wish, and if I can help, of course I'll be glad to." [6]

A communication of April 17, 1941, addressed to McMillan and McMillan, mentioned "a very contentious fellow" who would not go to Arkadelphia, but who asked [the writer] to get the lowest price on 14,000 acres the McMillans bought from Malvern Lumber Company; also on 10,000 acres around Caney:—". . . said that he was sure, if price was anything like right, he could handle both tracts." And in conclusion: "He said to let him know if you would name a price per acre on both tracts. He is evidently figuring on making some more on it, but we can't worry about that if we get ours." Beneath the

---

[5] Section 12477 of the Digest applies to ". . . any person : . . who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, . . . auctions or offers to auction, or negotiate the purchase or sale or exchange of real estate . . . for others, as a whole or partial vocation. . . . The term . . . shall also include any person . . . employed by the owner . . . of real estate, at a stated salary or commission, to sell such real estate, and who shall sell or exchange or offer or attempt to negotiate the sale. . . . One act for a compensation or valuable consideration . . . shall constitute the one performing it a real estate broker . . . within the meaning of this Act. . . . No recovery may be had by any broker or salesman in any court of this State on a suit to collect a commission due him unless he is licensed under the provisions of this Act, and unless such fact is stated in his complaint."

[6] Punctuation supplied.

signature was an undesignated postscript promising to "keep confidential any price you name, if you name it."

An undated letter written by Dunlap to the McMillans mentioned certain tracts on "the Roland estate" for which $3 per acre was asked, "but am sure you can buy cheaper." Information was given that described lands owned by J. K. Hall were to be sold at the court house May 19 under sealed bids, but "I talked to their representative and he said it was possible to sell on 'outright' price." Descriptions were enclosed with the comment: "If interested look them over and let me hear. I'll either work through you for my commission or submit a bid to them of your price, less my commission." Other lands were mentioned—three separate holdings.

Dunlap admitted having contracted with Arthur C. Cearley, of Sheridan. This language appears in the writing:

". . . in the event either or both parties shall sell, or cause to be sold, the [fourteen thousand acres] . . . which Dunlap has contract from McMillan to sell, or caused to be sold for McMillan *and is to receive for his services in the sale of said lands* the sum of twenty-five cents per acre. . . ."

The contract with Cearley, said Dunlap, covered the subject-matter of this suit; and, he added: "I had a contract with Cothern as to Dierks Lumber and Coal Company, and with Cearley as to Long Bell Lumber Company. I was trying to get some one to help me sell that land to earn that two bits an acre."[7]

Another letter (the only date being "Saturday") mentions 8,000 acres and contains the statement: "I contracted with [the McMillans] to help me in the sale." There was a reference to Bill Murray, "another real estate man." In his explanation Dunlap said: "I was looking for some one to sell that 14,000 acres to when I wrote the other letter dated Saturday. I was not going to have anything to do with the price." He then testi-

---

[7] Reference by Dunlap to Long Bell Lumber Company seems to have been in connection with his plan to have Cearley arrange a meeting between the McMillans and a representative of Long Bell.

fied: "I set the price [at $5.50 per acre] because [McMillan] had made Long Bell a price of $5.50 and I suspected he would take that sum—I know he would take it."

Still another "Saturday" letter, addressed to D. W. McMillan, speaks of having received an inquiry regarding 3,600 acres in Dallas county:—"He wants to know if I could sell part or all of it, and the price." Other statements in the letter related to the writer's interest in realty.

An advertisement published in the Arkansas Gazette of June 29, 1941, was: "Eight thousand acres of timber land for sale. Attractive price in block. Howard, Little River, and Sevier counties. Also 3,600 acres in Dallas county. Howard Dunlap, Malvern, Arkansas."

Cothern testified regarding his trip to Mountain Pine with Dunlap and the McMillans:—"I was told by 'Bruce' Scott that he and Dunlap had a tract they wanted to sell. Later Dunlap told me he could get twenty-five cents per acre if he could sell this land for the McMillans.[8] While they were waiting Cothern remarked that Hopson had said the land was probably worth $3.50 per acre:—"Bill McMillan then said, 'Let's go! I can't wait. We can't sell any land for that price. There is no use wasting our time in waiting for [Hopson].' "

Cothern was very positive in asserting that he did not carry on any negotiations, nor did he make any offer to sell on behalf of the McMillans, or "have anything to do with the negotiations." He was merely to get "part of the brokerage commission" for participating in the introductions.

H. W. McMillan, testifying, said he first met Dunlap in February, 1941. Dunlap came to his office for assistance in obtaining an FHA loan. He did not know Cothern was associated with Dunlap in the Dierks negotiations until the trip from Hot Springs to Mountain Pine was made. Several conferences between the McMillans and Dunlap occurred in Arkadelphia. On one occasion

---

[8] Statements by this witness do not differ materially from those made by Dunlap, except that he thought they arrived at the Dierks office about 2:30 and left at four o'clock. .

Dunlap proposed to sell 8,600 acres in Sevier and Howard counties. He mentioned various real estate matters and said he was advertising extensively in Eastern newspapers; also in Chicago and St. Louis, and in the Arkansas Gazette. Dunlap asserted that he had contacts beyond the State, "prospects we probably would not know anything about, and he would like to have an opportunity to sell our lands."[9]

Adverting to conversations while waiting near the Dierks office, McMillan testified Cothern told him he thought they could get $3, or $3.50, for the land:—"He felt sure we would get $3, and [Cothern thought] that was a very good price. . . . The long and short of it was we told [Dunlap and Cothern] we were not going to sell our land for $3 or $3.50, and that to talk with Hopson on any such basis would be an indication we might consider that kind of a proposition. . . . [At that time] the mill had quit running and people in the office were fixing to close up. We got in the car, [went back to Hot Springs], let them out, came on home—and I forgot about the matter."

McMillan denied that he had contacted Hopson or anyone connected with Dierks. Leeper, said the witness, had consistently asserted the land would be bought by Dierks. The McMillans took no steps to sell to Dierks, believing that any chance to dispose of the property at $5 or more per acre had been spoiled by the quotation of $3 or $3.50 they thought had been made by Cothern.[10]

"Some months later," according to the witness, Hopson told the elder McMillan that Mr. Dierks wanted to see him about the land, "and Dad went over."

D. W. McMillan's testimony was along the same line as that of his son, except more in detail.

[9] In testifying, McMillan said that Dunlap ". . . told us he had contacted John G. Lonsdale, one of the trustees of Kansas City Southern Railroad, . . . with the idea of selling Mr. Lonsdale our lands." [The meeting is alleged to have occurred at Park Hotel.] . . . "He had some letters and contacts with some people in New Hampshire by the name of Andrews. He was also dealing with Moline Timber Company."

[10] The sale to Dierks in 1942 was at $5 per acre. Cothern denied having mentioned a price to Hopson or anyone connected with Dierks. [The McMillans paid $2 for the land; but, after taxes and other expenses were added, the cost was "about $3.25."]

Substance of Hopson's testimony was that he had charge of buying timber for Dierks' Mountain Pine mill. Leeper offered Dierks the 14,000 acre tract when he had an option from Malvern Lumber Company. The option price was $2. Leeper wanted $2.50. The Company declined. Leeper later told Hopson a sale had been made to the McMillans. Frequently, thereafter, Leeper would insist that Dierks should buy. About a month before the McMillans contracted with Dierks, Leeper supplied Dierks a plat and said, "They are fixing to sell to someone else, and if you fellows are interested you had better get after it." The witness said that shortly thereafter he drove Mr. Dierks over the property. When they returned to Hot Springs Dierks instructed him to call McMillan. This was done, and the following day. the contract was made. The first time Hopson saw Dunlap was in the spring of 1942, following sale by the McMillans. The witness did not remember that Cothern even mentioned the land until after it had been sold to Dierks. There was the assertion that "Neither Dunlap nor Cothern had anything whatever to do with the sale."

Allen Bryant testified that during the latter part of April, 1941, he went to Mountain Pine with Dunlap and Cothern. Cothern spoke to Hopson, mentioning that "there are parties" who then owned 14,000 acres formerly held by Malvern Lumber Company. Hopson is alleged to have said that Dierks did not want it "about a year ago, but wants it now. . . . I would like to see the owners and talk with them, and buy the land if it isn't too high." Hopson replied that he could not see them until two days later. He further testified that in the spring of 1942 he again talked with Hopson and asked if Dierks had not bought the McMillan land. Hopson admitted this was true and stated that a commission was paid Leeper. Cothern is alleged to have said to Hopson, "Didn't you know I had a part in that by me telling you about it?" Hopson replied that he had forgotten about it, but did recall the transaction when reminded of it by Cothern.

### Other Facts—and Opinion.

Fred Dierks, one of the owners of the lumber and coal company bearing his name, went from his Kansas City home to Hot Springs. He was in Arkansas in February, 1942. Hopson drove with him through some of the McMillan lands. Dierks asked Hopson who owned the property. Hopson's testimony is to the effect that his information as to ownership came from Leeper, and from facts independently ascertained. He is partially contradicted by Bryant, who says Hopson admitted Cothern had informed him the McMillans were willing to sell. But the case does not turn upon this question of fact.

Dunlap insists his only duty was the simple function of introducing seller and buyer—that is, he was to "bring them together" and make known to each the other's state of mind in respect of the subject-matter. It is not necessary to determine whether, with facts admittedly as appellees argue them, recovery is prohibited by § 12477 of the Digest. Dunlap's activities, as reflected by his letters and undisputed statements, involved more than an introduction of willing clients. Likewise, his contract provided for a commission on land Dunlap sold, or on any sold through his broker.

There appears to be an unnecessary "you" in the second paragraph of McMillan's proposal. It reads: ". . . we would be willing to pay you and the broker together at the rate of twenty-five cents an acre *for any land you sold through you or your broker.*" [11] if we eliminate this seemingly superfluous word, the case is not strengthened for appellees. The obligation would then be to pay on any land sold through Dunlap or his broker. In the instant case Cothern cannot be the broker; for, like Dunlap, he is unlicensed, and an unlicensed broker is within the statute's ban. In *Nelson* v. *Stolz,* 197 Ark. 1053, 127 S. W. 2d 138, recovery was denied one who was not licensed at the time he procured purchasers who entered into an enforcible contract.[12]

If it be conceded that Bryant's testimony injected a factual question, and that it was admissible as going to

---

[11] Italics supplied.

[12] See *Birnbach* v. *Kirspel,* 188 Ark. 792, 67 S. W. 2d 730.

the credibility of Hopson, there is still lacking evidence of a substantial nature that Dierks Lumber and Coal Company and the McMillans were "introduced," or "brought together," through Dunlap; nor is there testimony upon which to predicate a liability to Cothern, whose interest was unknown to the McMillans. The trip from Hot Springs to Mountain Pine was void of any result other than disclosure to the McMillans that Dunlap was seeking to effectuate a sale to Dierks. The expected meeting with Hopson did not take place. What Dunlap and Cothern may have said to Hopson at a later date, or on subsequent occasions, is speculative. Give full credit to Bryant's testimony: still, Dierks and the McMillans were not introduced within meaning of the offer of April 16: an offer requiring payment to Dunlap if land should be sold through him or his broker. It is our view that the contract (which we are not at liberty to vary) contemplated affirmative action by Dunlap in addition to the formality of an introduction. Support for this construction is found in Dunlap's contract with Cearley, where the statement is that the commission is payable for services rendered "in the sale of said lands." Again it is recited that in the event either Dunlap or Cearley "shall sell, or cause [the McMillan lands] to be sold," Dunlap is to be compensated.

Certainly Dunlap made contracts, held himself out as a real estate man, took options, quoted prices, advertised, and in other respects invited interested parties to utilize his services. He offered to make contacts, independent of introductions. It was such activities as these that the Legislature sought to have supervised, and to that end the Real Estate Commission was created, its duties defined, and restrictions were imposed upon those who would hold themselves out as realtors, agents, or brokers.

The judgment is reversed and the cause is dismissed.